**In re SOUTH SHORE VENDING, INC., Debtor.**

**Bankruptcy No. 81–652–HL.**

United States Bankruptcy Court, D. Massachusetts.

Oct. 29, 1982.

Joseph F. Ryan, Brown, Rudnick, Freed & Gesmer, Boston, Mass., Dean P. Nicastro, Asst. City Sol., Quincy, Mass., for debtor.

## MEMORANDUM ON PERSONAL PROPERTY TAX CLAIM OF THE CITY OF QUINCY

HAROLD LAVIEN, Bankruptcy Judge.

South Shore Vending, Inc., (South Shore) filed its Chapter 11 bankruptcy petition on April 16, 1981. South Shore objects to the claim of the City of Quincy for $30,807.37 in personal property taxes plus interest of $6,843.20. The City asserts a priority status for these claims based on 11 U.S.C. § 507(a)(6)(B) and also claims post-petition taxes as an administrative claim under 11 U.S.C. § 503(b)(1)(B).

South Shore is in the business of placing vending machines, pinball machines, video games, juke boxes and other coin-operated machines in various locations to serve the general public. The City claims that it is owed personal property taxes on these various machines for fiscal tax years 1975–1982. South Shore denies any liability claiming that under Massachusetts law, these machines are exempt from taxation. The issue has been submitted to the court on a stipulation of facts and briefs.

Mass.Gen.Laws ch. 59 § 2 provides that "[a]ll property, real and personal, situated within the Commonwealth and all personal property of the inhabitants of the Commonwealth wherever situated, *unless expressly exempt,* shall be subject to taxation..." (emphasis added). South Shore claims that its personal property is exempt under Mass. Gen.Laws ch. 59, § 5.

That statute provides that "machinery used in the conduct of business" will be subject to taxation except that machinery "as used in this clause, shall not be deemed to include stock in trade or any personal property directly used ... in any purchasing, selling, accounting or administrative function." Mass.Gen.Laws ch. 59 § 5, clause sixteenth, paragraph 2(a). South Shore argues that its machines fall within the exemption because the machines are used for a selling function or in the alternative, are its stock in trade.

None of these machines fall within the exception for stock in trade. In *Collector of Taxes of Boston v. Cigarette Service Co., Inc.,* 325 Mass. 162, 89 N.E.2d 787 (1950), the Supreme Judicial Court held that cigarettes are stock in trade, not the machines used to vend them. Clearly, the vending machines in this case are no different and are not stock in trade. Only the

products that the machines dispense are stock in trade. As to the pinball machines, video games and juke boxes, these machines theoretically dispense entertainment. The stock in trade is the performance of the machines, not the machines themselves. *Boston v. Mac-Gray Co.*, 371 Mass. 825, 359 N.E.2d 946 (1977) (self-service laundry machines which customers pay to use are not stock in trade).

Although the machines are not stock in trade, the machines would still be exempt from tax if they were used "in any purchasing, selling, accounting or administrative function." Mass.Gen.Laws ch. 59 § 5 as amended St.1954, Ch. 435, § 1. The statute was amended sometime after the Supreme Judicial Court had held that cigarette vending machines were taxable. Vending machines sell candy or cigarettes and thus fall within the language of the statute exempting from taxation machines which perform a selling function. The vending machine adds nothing to the product and is merely the device for passing the product from South Shore to the customer. While a coffee machine may keep the product fresh by heat or refrigeration, the candy and cigarette machines don't even do that. The City argues that the newer language was only meant to cover business and accounting type machinery, not vending machines. However, the language of the statute is on its face not that limited. Words and phrases used in Massachusetts statutes "shall be construed according to the common and approved usage of the language..." Mass. Gen.Laws ch. 4 § 6. I can see no reason to give the term "selling function" the narrow construction the City argues for.

In support of its argument, the City cites *Boston v. Mac-Gray Co.*, 371 Mass. 825 at 828, 359 N.E.2d 946 (1977) where the Supreme Judicial Court stated that clause Sixteenth "has not been amended to alter the result which we reached in the *Cigarette Service Co.* case."  In that comment, the Court was referring to its determination that vending machines were not stock in trade and was not considering the new language referring to machines which perform selling or purchasing functions. Thus, I find that the vending machines perform the function of selling candy, cigarettes, coffee, etc., and are exempt from personal property taxes pursuant to Mass.Gen.Laws ch. 59, § 5.[1] I note in passing that the verb "to vend" is a synonym for the verb "to sell".

The issue still remains as to whether the pinball machines, video games, and juke boxes are subject to taxation. The debtor argues that these machines sell entertainment and thus are exempt from taxation because they also perform a selling function. In *Ultronic Systems Corp. v. Board of Assessors of Boston*, 355 Mass. 284, 244 N.E.2d 318 (1969), the Supreme Judicial Court held that a computer memory drum did not fall within the category of personal property used in "any purchasing, selling, accounting or administrative function." The sole function of the drum was to receive, store and transmit a vast supply of information, which information was the taxpayer's stock in trade. The Court reasoned that the amended language did not exempt machinery principally involved in producing or processing the debtor's stock in trade. Unlike the vending machines which sell something which was purchased elsewhere, juke boxes, pinball machines and video games produce the actual product, namely, entertainment. The amendment to the statute and the case interpreting the statute seem to distinguish equipment whose primary function is to aid some administrative function, such as adding machines or cash registers, or machines that substitute for or aid sales personnel, such as vending machines, as opposed to equipment that is used to manufacture, process or convert raw materials into a different finished

---

1. In fact, language in the *Cigarette Service Co.* case supports this conclusion:

   (Cigarette Service Co.'s) sole business was the *sale* of different brands of cigarettes by means of vending machines... The machines were the sole means ... for the con-

   duct of its business and were used only for the *sale* of cigarettes. (emphasis added). *Collector of Taxes of Boston v. Cigarette Service Co., Inc.*, 325 Mass. 162 at 164, 89 N.E.2d 787 (1950).

product. One example of production equipment is the movie projector which converts electricity and film into a movie. *See Assessors of Brockton v. Brockton Olympia Realty Co.,* 322 Mass. 351, 77 N.E.2d 391 (1948). One cannot purchase a finished product from a video or pinball machine; rather, the product is the game which is manufactured by the machine. One could literally smash the vending machine and steal the product being vended but there is no game to be stolen from inside the entertainment machines. A coffee vending machine does tend to cross and blur the above distinction. However, while it may not be free from doubt, I would find that the coffee machines perform a sales function rather than the game machines' creative function, and I find that the various entertainment producing machines are not within the tax exemption of Mass.Gen.Laws ch. 59 § 5.

The City of Quincy has made a claim for interest on the unpaid taxes. The City is entitled to interest on its allowed claim up until the date the bankruptcy petition was filed, April 16, 1981. Post-petition interest is not allowed on unsecured pre-petition tax claims.[2] *City of New York v. Saper,* 336 U.S. 328, 69 S.Ct. 554, 93 L.Ed. 710 (1949); *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *United States v. General Engineering & Manufacturing Co.,* 188 F.2d 80 (8th Cir.1951) aff'd per curiam 342 U.S. 912, 73 S.Ct. 646, 96 L.Ed. 1328 (1952).

The final issue to be determined is the priority or non-priority status of the allowed tax claim of the City of Quincy. First, the City's tax claim for fiscal 1982 arose after the petition was filed and is therefore entitled to be treated as an administrative expense under 11 U.S.C. § 503(b)(1)(B). As to the remaining claim

for the taxes for fiscal 1975–1981, the sixth priority only applies to a "property tax assessed before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition." 11 U.S.C. § 507(a)(6)(B), i.e., after April 16, 1980. The question presented is whether there was any penalty and if so, when did it arise. The debtor argues that as soon as interest accrues on the unpaid tax, a penalty has arisen. However, I would agree with the case cited by the City:

> If the charge here in controversy is to be regarded as interest, the trustee ought to pay it. Penalties, however, stand upon a different footing. It cannot be said that a penalty imposed for failure to pay a tax is a part of the original tax, in the sense that interest is. By "interest" is ordinarily understood a charge for the use of money or damages for the detention of it. A penalty, as applied to cases of this character, means a punishment imposed for failure to make the payment on time. *In re Ashland Emery & Corundum Co.,* 229 F. 829 (D.C.Mass.1916).

The charging of interest on the tax claim as provided in Mass.Gen.Laws ch. 59 § 57 is not penal in nature. However, that does not dispose of the penalty problem. Once the tax has not been paid, and before the collector can sell the property pursuant to Mass.Gen.Laws ch. 60 § 24, the assessor makes a demand adding a $2 demand charge and then issues a warrant to the tax collector. That warrant permits the collector to "levy said tax by distress or seizure and sale of (the taxpayer's) goods." Once this warrant is issued, the collector's right to sell the property creates the right to pursue a penalty type remedy for non-payment. At this point, the equivalent to a penalty potential exists that brings the tax within the time limitations, purpose, and intended meaning of 11 U.S.C. § 507(a)(6)(B). The assessor's warrants

---

**2.** The City, in its initial brief, appears to concede the point, stating on page 10 of its initial brief:

> *Post-Petition Interest*—The City "throws in its oar" for whatever interest might be payable on its claims at the legal rate from the date of

the filing of the debtor's petition pursuant to 11 U.S.C. s. 726(a)(5).

Note however that section 726(a)(5) would not be applicable in a Chapter 11 proceeding. 11 U.S.C. § 103(b).

were issued before April 16, 1980 for fiscal years before 1979, therefore those taxes are outside of the one-year period of § 507(a)(6)(B). It is not that the Court is considering the $2 demand charge as in and of itself being a sufficient penalty. The Court is inclined to agree with the City that if this were the only manifestation of a penalty, it would be "de minimus". However, the consequences that come from the warrant issued to the collector as a result of the taxpayer's failure to pay the demand provide that collection can be made through the penal process, i.e., seizure and sale of the taxpayer's goods.

On the other hand, it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning and should be disregarded when it defeats the manifest purpose of the statute as a whole. *Cartledge v. Miller*, 457 F.Supp. 1146, 1154 (S.D.N.Y.1978) quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2nd Cir. 1960).

According to the City's brief, the last demand made before April 16, 1980 was for fiscal year 1979. No demand has been made for fiscal years 1980 and 1981, thus the tax for 1980 and 1981 on the entertainment machinery is entitled to § 507(a)(6)(B) priority.

The City has submitted its calculation of taxes and the debtor has taken no exception to the figures resulting in the following claim and status, which I so rule and find.

Assessed Tax and Pre-petition Interest on All Machines Except Food and Cigarette Dispensing Machines

| FY | TAX | PRE-PETITION INTEREST | TOTALS |
|---|---|---|---|
| 1975 | $ 1,199.25 | $ 601.59 | $ 1,800.84 |
| 1976 | 2,478.45 | 1,038.33 | 3,516.78 |
| 1977 | 2,931.74 | 977.35 | 3,909.09 |
| 1978 | 3,515.09 | 1,113.25 | 4,628.34 |
| 1979 | 4,644.68 | 1,045.99 | 5,690.67 |
| TOTAL GENERAL UNSECURED CLAIM | | | $19,545.72 |
| 1980 | 4,351.20 | 720.12 | 5,071.32 |
| 1981 | 3,960.45 | 149.62 | 4,110.07 |
| TOTAL § 507(a)(6)(B) PRIORITY CLAIM | | | $ 9,181.39 |
| TOTAL § 503(b)(1)(B) ADMINISTRATIVE CLAIM | | | $ 2,241.04 |

The City of Quincy's claim will be allowed in the above amounts and priorities.